IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Craig B. Shaffer

Civil Action No. 14-cv-00337-CBS

EVELYN HOHENBERGER, individually and as representative of the estate of Thomas
Hohenberger,
        Plaintiff,
v.

UNITED STATES OF AMERICA,
        Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

This civil action came before the court for a three-day bench trial on July 13 to July 15,

2015 on Plaintiff's claim under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 *et seq.*

The court has jurisdiction over Plaintiff's FTCA claim. 28 U.S.C. §§ 1346(b), 2671-2680.   The

case was directly assigned to the Magistrate Judge pursuant to 28 U.S.C. § 636(c) and D.C.

COLO. LCivR 72.2.   Evelyn Hohenberger brings the action on her own behalf and on behalf of

the estate of her deceased husband, claiming that his death was the result of negligent medical

treatment by the Veterans Administration ("VA").   The court makes findings of fact and

conclusions of law pursuant to Fed. R. Civ. P. 52(a)(1).


I.      Applicable Law

        The United States, as a sovereign, is absolutely immune from suit and, unless Congress

has unequivocally consented to permit a cause of action, no court has jurisdiction to entertain a

claim against it.   *United States v. Sherwood*, 312 U.S. 584, 586–87 (1941).   Congress created a

limited waiver of sovereign immunity of the United States by enacting the FTCA.   *See Ali v. Fed.*

*Bureau of Prisons*, 552 U.S. 214, 217–18 (2008) ("In the FTCA, Congress waived the United States' sovereign immunity for claims arising out of torts committed by federal employees.").   The FTCA's provisions must be strictly construed in favor of the United States.   *Lane v. Peña*, 518 U.S.187, 192 (1996);   *Hart v. Dep't of Labor ex rel. United States of America*, 116 F.3d 1338, 1339 (10th Cir. 1997).[1]   The FTCA authorizes "claims against the United States, for money damages . . . for injury or loss of property . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."   28 U.S.C. § 1346(b)(1).   *See also* 28 U.S.C. § 2674 (FTCA creates liability for certain torts committed by agencies of the United States or their employees "in the same manner and to the same extent as a private individual under like circumstances. . . .").   Thus, "[t]o determine the liability of the federal government under the FTCA, it is necessary to apply the law of the place where the alleged negligence occurred."   *Jones v. United States*, 355 F. App'x 117, 120 (10th Cir. 2009) (citation omitted).   "[Section] 1346(b)'s reference to the law of the place means law of the State -- the source of substantive liability under the FTCA."   *FDIC v. Meyer*, 510 U.S. 471, 478 (1994) (internal quotation marks and citation omitted).   *See also Molzof v. United States*, 502 U.S. 301, 305 (1992) (in medical malpractice cases "the extent of the United States' liability under the FTCA is generally determined by reference to state law.").   As the acts and omissions alleged here occurred in the District of Colorado, the parties do not dispute that the liability of the USA is measured against the standards for medical malpractice in the State of Colorado.   *See Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1117 (10th Cir. 2004) ("State substantive law applies to suits brought against the United States under the FTCA.") (citing 28 U.S.C. § 1346(b)(1)).

---

[1]      It is undisputed the Plaintiff exhausted her administrative remedies prior to filing her claim in this court.   (*See* Trial Exhibit ("Tr. Ex.") 3 (Claim for Damage, Injury, or Death (SF 95)).

"Colorado law treats medical malpractice actions as a particular type of negligence action." *Gallardo v. United States*, 752 F.3d 865, 870 (10th Cir. 2014) (internal quotation marks, brackets, and citation omitted)).   To prove a medical malpractice claim under Colorado law, Plaintiff "must show a legal duty of care on the defendant's part, breach of that duty, injury to the plaintiff, and that the defendant's breach caused the plaintiff's injury." *Gallardo*, 752 F.3d at 870 (internal quotation marks and citation omitted).   "A physician's duty arises out of a[n] [express or implied] contractual relationship when a physician undertakes to treat or otherwise provide medical care to another." *Id.* at 870.   "Colorado law implies that a physician employed to treat a patient contracts with his patient that: (1) he possesses that reasonable degree of learning and skill which is ordinarily possessed by others of the profession; (2) he will use reasonable and ordinary care and diligence in the exercise of his skill and the application of his knowledge to accomplish the purpose for which he is employed; and (3) he will use his best judgment in the application of his skill in deciding upon the nature of the injury and the best mode of treatment." *Id.* at 870-71 (internal quotation marks and citation omitted).

"[I]f a physician possesses ordinary skill and exercises ordinary care in applying it, he is not responsible for a mistake of judgment." *Gallardo*, 752 F.3d at 871.   Even "a physician possessing ordinary skill and exercising ordinary care in applying it . . . does not guarantee a successful outcome." *Gallardo*, 752 F.3d at 870-71 (internal quotation marks and citation omitted).   "[A] poor outcome does not, standing alone, constitute negligence." *Id.*   *See also* CJI-Civ. 15:4 ("An unsuccessful outcome does not, by itself, mean that a physician was negligent. An exercise of judgment that results in an unsuccessful outcome does not, by itself, mean that a physician was negligent.").   "[A] breach of the applicable standard of care is required." *Gallardo*, 752 F.3d at 871.

Plaintiff contends through her medical witness that Paul Preston, M.D. failed to meet the standard of care by not conducting certain tests and not providing certain treatment that would have diagnosed and treated Mr. Hohenberger's coronary artery disease.   (*See* Trial Transcript ("Trial Tr.") at 12, 254 ("Mr. Hohenberger had many symptoms, signs, and even imaging studies that suggested that he might have some form of . . . coronary artery disease. Those things were not appropriately investigated and subsequently not appropriately treated.")).   "To establish a breach of the duty of care in a medical malpractice action, the plaintiff must show that the defendant failed to conform to the standard of care ordinarily possessed and exercised by members of the same school of medicine practiced by the defendant."   *Gallardo*, 752 F.3d at 870-71 (internal quotation marks and citation omitted).   "That standard of care is measured by whether a reasonably careful physician of the same school of medicine as the defendant would have acted in the same manner as did the defendant in treating and caring for the patient."   *Id.* "Thus, the standard of care for medical malpractice is an objective one."   *Id.*   "Unless the subject matter of a medical malpractice action lies within the ambit of common knowledge or experience of ordinary persons, the plaintiff must establish the controlling standard of care, as well as the defendant's failure to adhere to that standard, by expert opinion testimony."   *Gallardo*, 752 F.3d at 870-71 (internal quotation marks and citation omitted).   "[M]atters relating to medical diagnosis and treatment ordinarily involve a level of technical knowledge and skill beyond the realm of lay knowledge and experience."   *Id.*   "Without expert opinion testimony in such cases, the trier of fact would be left with no standard at all against which to evaluate the defendant's conduct."   *Id.*

Plaintiff must also show that a breach of the duty of care caused the injury.   *Gallardo*, 752 F.3d at 870 (internal quotation marks and citation omitted).   To prove causation in a negligence case, the plaintiff must show by a preponderance of the evidence that the injury would not have

occurred but for the defendant's negligent conduct. *Basanti v. Metcalf*, No. 1-cv-02765-PAB-NYW, 2015 WL 868758, at * 27 (D. Colo. Feb. 26, 2015) (citations omitted). "The existence of a causative link between the plaintiff's injuries and the defendant's negligence is a question of fact and it is within the province of the fact-finder to determine the relationship between the defendant's negligence and the plaintiff's condition, as long as the evidence establishes such facts and circumstances as would indicate with reasonable probability that causation exists." *Kaiser Found. Health Plan of Colorado v. Sharp*, 741 P.2d 714, 719 (Colo. 1987) (internal quotation marks and citation omitted). *See also Reigel v. SavaSeniorCare L.L.C.*, 292 P.2d 977, 987 (Colo. App. 2011) (plaintiff must prove that defendant's conduct was a cause without which the injury would not have occurred; it is insufficient to establish only that the allegedly negligent conduct increased the risk of harm); CJI-Civ. 9:18 ("Cause" is "an act or failure to act which in natural and probable sequence produced the claimed injury. It is a cause without which the claimed injury would not have happened."). "To create a triable issue of fact regarding causation in a medical malpractice case, . . . the plaintiff must establish causation beyond mere possibility or speculation." *Kaiser Found. Health Plan of Colorado v. Sharp*, 741 P.2d at 719 (citations omitted).

II.     Findings of Fact and Conclusions of Law

Thomas Hohenberger, a veteran, was under the regular medical care of Dr. Preston at the VA Medical Center in Grand Junction, Colorado from 1998 to the date of his death on September 24, 2011 at the age of 65. The parties have stipulated that the cause of Mr. Hohenberger's sudden cardiac death was ischemic heart disease due to coronary artery atherosclerosis, or coronary artery disease ("CAD"). (*See* Tr. Ex. 7, Postmortem Examination Report; Trial Tr. at

320; Final Pretrial Order Stipulation No. 4 (Doc. # 53 at 5 of 10); *see also* Trial Tr. at 362-63, 461).

Mr. and Mrs. Hohenberger were married in 1992.   (*See* Trial Tr. at 267).   Mr. Hohenberger adopted her two children and was involved in family life.   (*See* Trial Tr. at 268-73). He was her caretaker when she had a serious illness in 2004.   (*See* Trial Tr. at 273-75).   She cared for him through his alcoholism, PTSD, and other illnesses.   (*See* Trial Tr. at 269-70, 278, 282-83).   They had a long, loving relationship until the end of his life.   (*See* Trial Tr. at 277, 281-82, 285-86, 299).   His death was a difficult loss for Mrs. Hohenberger.

Dr. Preston has been employed at the VA Medical Center in Grand Junction, Colorado since August 1996.   (*See* Tr. Ex. 17 at US 02555 (Dr. Preston Curriculum Vitae ("CV"))).   Dr. Preston has been board-certified in internal medicine since 1986.   (*See* Tr. Ex. 17 at US 02554; Trial Tr. at 97).   Dr. Preston has worked in primary care medicine in public service for his entire career and has treated thousands of veterans.   (*See* Tr. Ex. 17 at US 02555; Trial Tr. at 103-04). Adult primary care medicine comprises two specialties: internal medicine and family medicine. (*See* Trial Tr. at 27).   Primary care providers are generalists who provide a broad range of medical care for their patients.   (Trial Tr. at 27, 98, 312).   "A primary care provider sees patients on a regular basis trying to do education and also anticipate further health problems, treat acute disease, [do] routine laboratory testing, [and] address patient's habits that may influence their health."   (*See* Trial Tr. at 98).

A.     Evidence of the Standard of Care

The expert opinions differ regarding the standard of care for administering additional clinical testing and treatment.   Plaintiff relies on testimony from Michael Jones, M.D.   Dr. Jones is a cardiologist who emphasizes the specialty practice of cardiology.   (*See* Trial Tr. at 242-49).

He is board-certified in cardiovascular medicine, or cardiology, and nuclear cardiology.   (*See* Trial Tr. at 243, 245-47).   He was board-certified in internal medicine from 2000 to 2010.   (*See* Trial Tr. at 243, 246).   Twenty-five percent of his practice is internal medicine.   (*See* Trial Tr. at 244, 250).   Dr. Jones assessed Dr. Preston's care of Mr. Hohenberger based on his review of the medical records and the autopsy report.   (*See* Tr. Ex. 7 at 4 of 4, Trial Tr. at 255, 401-67, 417, 428, 430, 433, 436, 454).   Dr. Jones opined that, in treating Mr. Hohenberger, Dr. Preston did not meet the standard of care for a primary care physician.   He opined that Mr. Hohenberger "should have had more aggressive evaluation for a cardiac illness," and "should have at the very least had a stress test performed."   (*See* Trial Tr. at 406, 410, 430).   "If . . . it had been shown that [Mr. Hohenberger] had an abnormal stress test," then he could have had an angiogram or been prescribed "a cholesterol-lowering agent."   (*See* Trial Tr. at 415, 430).

Defendant presented the testimony of two expert witnesses: Dr. Preston and John Johnson, M.D.   Dr. Preston served as Mr. Hohenberger's primary care physician from March 1998 to July 2011.   (*See* Tr. Ex. 1 at US 03334-35; Trial Tr. at 107, 132).   Dr. Preston saw Mr. Hohenberger for numerous primary care, follow-up, and acute care visits during a thirteen-year doctor-patient relationship between 1998 and 2011.   (*See, e.g.,* Tr. Ex. 1 at US 03388-90, 03496-97, 03516-17, 03547-49, 03559-61, 03573-74, 03589-90, 03660-61, 03671-72, 03690-91, 03713-14, 03716-17, 03720-21, 03725-26, 03729-31, 03926-3927; Trial Tr. at 48-51, 53-57, 62-63, 65-66, 68-69, 71-73, 76-80, 82-85, 289).   The last time Dr. Preston saw Mr. Hohenberger for an in-person primary care visit was February 1, 2011.   (*See* Supplemental Factual Stipulations (Doc. # 60), Tr. Ex. 1 at 03388-90).[2]   At the time of his death, Mr. Hohenberger was not scheduled for a visit with a primary care physician.   (*See* Doc. # 60 at ¶ 3).

---

[2]   Dr. Preston transferred to part-time work in inpatient and emergency care in 2011 and stopped seeing outpatients.   Mr. Hohenberger was reassigned to Dr. Ono.   (*See* Trial Tr. at 93-94, 106-07, 287-89, Tr. Ex. 1 at US 03334-35).

Dr. Johnson is board certified in family medicine and has been a primary care provider since 1988.   (*See* Trial Tr. at 312-13; Tr. Ex. 18 (Dr. Johnson CV)).   Drs. Johnson and Preston testified that if a patient does not have symptoms of CAD, the standard of care requires that a primary care physician identify the patient's risk factors for developing CAD and attempt to modify the risk factors that can be modified.   (*See* Trial Tr. at 125, 137-38, 141, 325-26 ("The standard of care . . . would be to identify what risks the patient has and to attempt to modify whatever risks they could. . . [c]holesterol levels would be an accepted test, checking blood glucose to make sure they're not diabetic, and then modifying whatever risk factors a particular patient has."), 331). This standard of care is supported by the United States Preventive Services Task Force ("USPSTF") and other medical literature.[3]   (Trial Tr. at 125; 317, 337).

B.   Coronary Artery Disease

It is uncontested that Mr. Hohenberger died of CAD.   "Coronary artery disease is what laymen call hardening of the arteries. . . . it's hardening and narrowing of the coronary arteries, the arteries that supply the blood flow to the heart muscle. . . . in this case we're looking at coronary -- the disease of coronary arteries themselves."   (*See* Trial Tr. at 319).   CAD is a leading cause of death in the United States, with up to 30% of all deaths attributable to CAD.   (*See* Trial Tr. at 362).   Symptoms of CAD usually progress and worsen over time.   (*See* Trial Tr. at 89, 324, 424, 442).   For approximately 15% of those who die of CAD, death is the first symptom of the disease. (*See id.*).

The physician witnesses agree that the risk factors for CAD include diabetes, smoking, age, gender, sedentary lifestyle, elevated cholesterol, family history, high blood pressure, and

---

[3]   The USPSTF is an independent, volunteer panel of national experts in primary care medicine that makes recommendations about clinical preventive services based on a review of existing peer-reviewed evidence.   (*See* Trial Tr. at 105-106, 318).

obesity.   (*See* Trial Tr. at 104-05, 107, 113-15, 325-27, 407-09, 449-50).   The two risk factors "that are weighted most heavily are smoking and diabetes."   (*See* Trial Tr. at 329).   Smoking, physical activity, cholesterol, diabetes, high blood pressure, and obesity are modifiable risk factors.   (*See* Trial Tr. at 113, 125, 137-38, 141, 326-27, 409-11, 450).   Age, gender, and family history are non-modifiable risk factors.

A symptom is defined as "a complaint, something that the patient voices to the physician." (*See* Trial Tr. at 320).   The physician witnesses agree that the typical symptoms of CAD include chest pain or angina, acute shortness of breath upon exertion, and extreme fatigue or weakness that are disproportionate to the patient's level of exertion.   (*See* Trial Tr. at 119, 124, 321-24, 417-18, 423-24).   There are also atypical symptoms of CAD.


1.     Chest Pain/Angina `

Angina is a classic, or typical, symptom of CAD.   (*See* Trial Tr. at 116-17, 321, 414). Angina is chest pain, pressure, or discomfort located in the mid-chest, associated with exertion, that lasts a few minutes, and is relieved by rest.   (*See* Trial Tr. at 116-17, 321, 414).   Other, atypical symptoms of CAD may occur with or without angina.   (*See* Trial Tr. at 117, 322-23). Females and diabetics may experience atypical symptoms without angina.   (*See id.*, 117, 323-24, 441).

Mr. Hohenberger was first referred to Dr. Preston on March 17, 1998 for "evaluation and treatment recommendation . . . regarding 51 year old [patient's] recent concerns [with] cardiac situation."   (*See* Tr. Ex. 1 at US 03936, Trial Tr. 48-49).   Mr. Hohenberger first saw Dr. Preston on March 18, 1998, shortly after he had an electrocardiogram ("EKG") and shortly before he was discharged from inpatient psychiatric treatment for Post Traumatic Stress Disorder ("PTSD").

(*See* Tr. Ex. 1 at US 03936, Trial Tr. 48-49).   Dr. Preston reviewed Mr. Hohenberger's medical record, which included a thallium stress test on June 7, 1995 that showed a normal result and that he did not have angina.   (*See* Tr. Ex. 1 at US 05005; Trial Tr. at 89, 137, 223-24).[4]   A chest x-ray showed possible signs of Chronic Obstructive Pulmonary Disease ("COPD") and no sign of active heart disease or change since 1993.   (*See* Tr. Ex. 1 at 03938, Trial Tr. at 53).   This record from 1998 contains the only reference to "questionable angina," which testing eliminated as a possibility.   (*See* Tr. Ex. 1 at US 05005; Trial Tr. at 89, 137, 223-24, 381).

It is undisputed that during the thirteen years that he was treated by Dr. Preston, Mr. Hohenberger did not have any typical symptoms of angina and never stated any complaint to Dr. Preston of classic angina.   (*See* Trial Tr. at 117, 337, 441-42).   Nor did he ever mention any chest pain to his wife.   (*See* Trial Tr. at 279).

2.   Shortness of Breath

Another typical symptom of CAD is acute onset of shortness of breath ("SOB" or dyspnea) that is disproportionate to the patient's level of exertion.   (*See* Trial Tr. at 119, 323-24, 423).  SOB related to CAD will be accompanied by angina.   (*See* Trial Tr. at 119, 121, 191, 323-24, 358, 423).   Chronic SOB that worsens in proportion to the level of exertion is a symptom of tobacco use and chronic obstructive pulmonary disease ("COPD").   (*See* Trial Tr. at 119).  COPD is a term for a group of lung diseases that block airflow to the lungs.   (*See* Trial Tr. at 120, 191, 357).   COPD is incurable.   (*See* Trial Tr. at 122, 452).   Smoking causes COPD, and shortness of breath is a typical symptom of COPD.   (*See* Trial Tr. at 191, 357).

The record demonstrates that Mr. Hohenberger complained of SOB only twice: on January

---

[4]      A thallium stress test measures blood flow to the heart during rest and during exercise, and a normal result on a thallium stress test indicates no evidence of heart attack or decreased blood flow to the heart.   (*See* Trial Tr. at 89, 136-37).

5, 2006 when he spoke to Cynthia Dearden, a VA nurse, by telephone and on July 2, 2008 during a primary care visit with Dr. Preston.   (*See* Tr. Ex. 1 at US 03547-49, 3594; Trial Tr. at 70, 78-80, 119, 190, 231-32).   When Mr. Hohenberger spoke by telephone with Ms. Dearden on January 5, 2006, he reported that he had SOB on exertion associated with a severe sore throat, fever, chills, cough, and muscle aches.   (*See* Tr. Ex. 1 at US 3594; Trial Tr. at 70).   This reported SOB was not necessarily a symptom of or consistent with CAD, but was consistent with bronchitis.   (*See* Trial Tr. at 75, 161, 231-32, 337-38, 443).   Mr. Hohenberger was prescribed an antibiotic and a cough suppressant and instructed to call if his symptoms persisted or worsened.   (*See* Tr. Ex. 1 at US 03594; Trial Tr. at 70-71).   Seven weeks later, at his next primary care visit with Dr. Preston on February 24, 2006, Mr. Hohenberger did not report any SOB.   (*See* Tr. Ex. 1 at US 03589-90; Trial Tr. at 162).

When Mr. Hohenberger reported SOB on July 2, 2008 during a primary care visit, Dr. Preston ordered a pulse oximetry test and a lung function study, which showed that Mr. Hohenberger had moderate COPD.   (*See* Tr. Ex. 1 at US 03545-47; Trial Tr. at 79, 120, 188-90, 358).   The July 2, 2008 primary care visit is the first time Dr. Preston diagnosed Mr. Hohenberger with COPD.   (*See* Tr. Ex. 1 at US 03544-45, Trial Tr. at 119-20, 189-91, 358).   Dr. Preston prescribed an inhaler to treat the SOB.   (*See* Tr. Ex. 1 at US 03544-45; Trial Tr. at 92, 122, 358).   Mr. Hohenberger's COPD never became severe enough to require oxygen therapy.   (*See* Trial Tr. at 188-89, 358, 454, Tr. Ex. 1 at US 03545).   Mr. Hohenberger's COPD remained moderate and was well-controlled with the inhalers prescribed by Dr. Preston.   (*See* Trial Tr. at 120, 169, 189-90, 358).   After he was prescribed an inhaler, Mr. Hohenberger never again complained to Dr. Preston of SOB.   (*See* Trial Tr. at 199, 204, 208, 358, 453).   Because SOB that is caused by COPD is triggered by a different mechanism than SOB that may be a symptom of CAD, inhalers to

treat SOB related to COPD do not treat SOB related to CAD.   (*See* Trial Tr. at 122-23, 359).   The

fact that Mr. Hohenberger's SOB was relieved by the inhaler indicates that his SOB was

consistent with COPD and not a symptom of CAD.   (*See* Trial Tr. at 191, 358, 454).   Plaintiff

does not dispute that Dr. Preston properly treated Mr. Hohenberger's COPD.   (*See* Trial Tr. at

358).

3.      Fatigue

Another typical symptom of CAD is extreme fatigue or weakness that is disproportionate to

the patient's level of exertion.   (*See* Trial Tr. at 124, 323-24, 423).   During the thirteen years that

Dr. Preston was Mr. Hohenberger's primary care physician, Mr. Hohenberger made only four

complaints of general fatigue.   Mr. Hohenberger first mentioned during his primary care visit on

February 24, 2006 that he had generally felt fatigued since he had been seriously ill with herpes

simplex encephalitis in July of 2005.   (*See* Tr. Ex. 1 at US 03589; Trial Tr. 71, 162, 282).   Herpes

simplex encephalitis is an infection that can be fatal and can cause long-term fatigue and "a

general rundown feeling."   (*See* Trial Tr. at 74, 434, 444).   Mr. Hohenberger also reported that

he was active at the time, was gradually feeling better, and was planning to build his own house in

the next couple of months.   (*See* Tr. Ex. 1 at US 03589; Trial Tr. at 71, 162, 303).   This complaint

of general fatigue was consistent with Mr. Hohenberger's clinical history of herpes simplex

encephalitis.   (*See* Tr. Ex. 1 at US 03589; Trial Tr. at 74, 338).

Mr. Hohenberger next reported fatigue at a primary care visit on February 14, 2007.   (*See*

Tr. Ex. 1 at US 03574; Trial Tr. at 76).   Other than a low blood level of the male hormone

testosterone, examination and laboratory tests indicated "everything looks fine."   (*See* Tr. Ex. 1

at US 03572-74).   Dr. Preston offered to prescribe testosterone replacement.   (*See* Tr. Ex. 1 at

3572).

Mr. Hohenberger also reported general fatigue at a primary care visit on July 2, 2008. (*See* Tr. Ex. 1 at US 03547-51, Trial Tr. at 78-79).   Mr. Hohenberger was no longer taking a testosterone prescription, which Dr. Preston resumed.   (*See* Tr. Ex. 1 at US 03547-51, Trial Tr. at 79).   Also on July 2, 2008, Mr. Hohenberger was diagnosed with COPD.   (*See* Tr. Ex. 1 at US 03544-47; Trial Tr. at 79, 119-20, 188-90, 358).   Despite his reports of general fatigue, Mr. Hohenberger continued to be very active.   (*See* Tr. Ex. 1 at US 03516; Trial Tr. at 194).   Shortly after a primary care visit on June 10, 2009, Mr. Hohenberger called the clinic and requested "testosterone in the mail for self inj[ection]," which he could receive after attending an instruction session in the RN clinic.   (*See* Tr. Ex. 1 at US 03515-16, Trial Tr. at 196-97, 281).   Mr. Hohenberger "continue[d] on his testosterone" and made no further reports of general fatigue to Dr. Preston.   (*See* Tr. Ex. 1 at US 03388-90, 03496-97, Trial Tr. at 444, *see also* Trial Tr. at 282). The general fatigue that Mr. Hohenberger reported to Dr. Preston was not the type of extreme exertional fatigue or weakness that would be a symptom of CAD.   (*See* Trial Tr. at 74, 94, 124, 197, 323, 338, 367-68, 372).   The general fatigue Mr. Hohenberger described was consistent with his clinical history of low testosterone, as well as his history of COPD and depression.   (*See* Tr. Ex. 1 at US 03548; Trial Tr. at 168, 444-45).

4.      Additional Medical Considerations

a.      Bradycardia

Beginning with Mr. Hohenberger's primary care visit on February 24, 2006, Dr. Preston reviewed previous electrocardiograms ("EKGs") and ordered regular EKGs.   (*See* Tr. Ex. 1 at US 05079-81, 05083-84; Trial Tr. at 47, 80, 91, 165-66, 178-79).   "An EKG is a graphic

13

representation of the electrical discharge of the heart, . . . a measurement of the heart's electrical system." (*See* Trial Tr. at 342).   It was Dr. Preston's practice to order EKGs for all smokers as a baseline for comparison in the event the patient reported to the emergency room with chest pain. (*See* Trial Tr. at 29, 165-66, 342-43).   Beginning on July 2, 2008, Mr. Hohenberger's EKGs showed sinus bradycardia, or a regular heart rate below 60 beats per minute.   (*See* Tr. Ex. 1 at US 05081, 05083-84; Trial Tr. 81, 166).   Bradycardia is only clinically significant if it is accompanied by symptoms, such as light-headedness or passing out (syncope).   (*See* Trial Tr. at 195, 343-44).   Mr. Hohenberger's bradycardia was consistent over many years, not accompanied by any symptoms, and appeared to be normal for him.   (*See* Trial Tr. at 81, 179, 196, 343-44, 442).   The evidence does not show that Mr. Hohenberger's bradycardia was a symptom of CAD that required further testing or treatment.   (*See* Trial Tr. at 343-44, 426 ("bradycardia frequently means nothing")).

   b.   Diffuse Atherosclerosis

   Atherosclerosis, or plaque, is a common condition as people age.   (*See* Trial Tr. at 88, 224, 346).   Diffuse atherosclerosis means that a person has a hardening of the blood vessels throughout the vascular system, in other words, all over the body.   (*See* Trial Tr. at 346).   There is no cure for atherosclerosis, and there are no medications to reduce atherosclerosis.   (*See* Trial Tr. at 370-71).   Treatment is provided for atherosclerosis only when the patient has symptoms of CAD.   (*See* Trial Tr. at 371).   Plaintiff contends that Mr. Hohenberger had diffuse atherosclerosis that should have prompted Dr. Preston to further test and treat him for CAD.

   On March 18, 1998, Dr. Preston noted that Mr. Hohenberger had a "history of right carotid plaque." (*See* Tr. Ex. 1 at US 03927; Trial Tr. at 51).   Carotid plaque is atherosclerosis.   (*See*

Trial Tr. at 224).   A thallium stress test performed on June 7, 1995 showed a normal result and

that he did not have atherosclerosis at that time.   (*See* Tr. Ex. 1 at US 05005; Trial Tr. at 89, 137,

223-24).   On March 12, 2001, in response to Mr. Hohenberger's complaint of "some scotomata in

the left eye approximately 2 months ago and again last week," Dr. Preston ordered a carotid artery

circulation test to determine if Mr. Hohenberger had amaurosis fugax, a condition caused by

plaque passing through the retinal artery.   (*See* Tr. Ex. 1 at US 03725-26; Trial Tr. at 88, 145).

The carotid artery circulation test result was normal, with no indication that Mr. Hohenberger had

diffuse atherosclerosis.   (*See* Trial Tr. at 146, 226).

On June 8, 2009, Dr. Preston ordered a leg circulation test in response to "symptoms that I

thought could possibly be related to peripheral artery disease."   (*See* Tr. Ex. 1 at US 03513-14;

Trial Tr. at 198).   The leg circulation test result was normal, indicating that Mr. Hohenberger did

not have diffuse atherosclerosis.   (*See* Tr. Ex. 1 at US 03513-14; Trial Tr. at 89, 198-99, 226).   In

2010, Dr. Preston ordered CT scans, which did not show any atherosclerosis.   (*See* Tr. Ex. 1 at

2844-45, 3494; Trial Tr. at 69, 83, 88, 227).   On February 1, 2011, in response to Mr.

Hohenberger's history of degenerative joint disease and complaint of low back pain, Dr. Preston

ordered an x-ray of his lumbosacral spine, which indicated that "aorta shows atherosclerotic

calcification."   (*See* Tr. Ex. 1 at US 02843; Trial Tr. at 54, 62, 65, 68, 86-87, 345).   Mr.

Hohenberger was 64 years old when the x-ray was taken.

Plaintiff contends that based on the presence of some atherosclerosis, Dr. Preston should

have further tested and treated him for CAD.   (*See* Trial Tr. at 420 ("All physicians should be

aware that . . . when someone has carotid plaque that there should be a workup and consideration

of plaques being in other locations.").   Through her medical witness, Plaintiff contends that if

atherosclerosis, or plaque, is present "in your leg artery it's likely accumulating in your heart

artery. If it's accumulating in your heart artery it's likely accumulating in your brain arteries and the arteries everywhere." (*See* Trial Tr. at 419; *see also* 431 ("The carotid artery is in the neck.   The abdominal aorta is in the abdomen.   So those are things that are full 24 inches away for most people, right? But if he has disease in one of those areas then he likely has it in another. So what's in the middle of those two areas?   Carotid, your chest, the heart. Below the heart, the abdomen, the aorta.")).

The weight of the evidence does not support Plaintiff's contention that Mr. Hohenberger had diffuse atherosclerosis that should have prompted Dr. Preston to further test and treat him for CAD.   The more persuasive evidence showed that if atherosclerosis is present in one part of the body, it is not necessarily present in other parts of the body.   (*See* Trial Tr. at 90, 199, 346). Neither the thallium stress test performed in 1995, the carotid artery circulation test performed in 2001, the leg circulation test performed in 2009, the CT scans performed in 2010, nor the x-rays performed in 2011 indicated that Mr. Hohenberger had diffuse atherosclerosis.[5]   (*See* Trial Tr. at 346).

c.     Risk Factors

A risk factor is a characteristic of the patient.   (See Trial Tr. at 321).   It is undisputed that Mr. Hohenberger was at the intermediate, or average, risk level for developing CAD.   (*See* Trial Tr. at 328-29, 348-49, 373-74, 381).   Mr. Hohenberger's risk factors for CAD were gender, age, tobacco use, and possibly family medical history.   (*See* Trial Tr. at 107, 115-16).   Smoking and age were Mr. Hohenberger's primary risk factors.   (See Trial Tr. at 408).   Dr. Preston was aware that Mr. Hohenberger's family history included his father's death at age 51 of a myocardial

---

[5]     As to other medical conditions discussed at trial, such as COPD, medications, and weight loss, there is no evidence showing that these conditions were related to or risk factors for CAD.   (*See* Trial Tr. at 123, 348, 359-61, 373, 452).

infarction.   (*See* Trial Tr. at 57).   He was also aware of Mr. Hohenberger's medical history of PTSD with depression, chronic alcohol dependence, and heavy tobacco use.   (*See* Trial Tr. at 48, 50-51, 57, 446).   Mr. Hohenberger smoked as much as two packs of cigarettes per day since the age of 18 or younger.   (*See* Tr. Ex. 1 at US 03389, 03489-90, 03517, 03547, 03559, 03590, 03661, 03671, 03690, 03713, 03716, 03726, 03730, 03926;   Trial Tr. at 48, 57, 62, 65, 69, 72-73, 77, 143, 146-49, 151, 153-55, 157, 160, 166, 172-73, 179, 192, 200, 204, 208-09, 280, 356-57). Smoking increases the risk of CAD by "lead[ing] to increased plaque deposition from cholesterol leading to coronary artery disease in the coronary arteries.   It essentially causes the hardening of the arteries, decreases blood supply to the arteries themselves."   (*See* Trial Tr. at 326, 109, 359, 407).   At every primary care visit, Dr. Preston counseled Mr. Hohenberger to quit smoking.   (*See* Tr. Ex. 1 at *id.*, Trial Tr. at 57, 63, 65-69, 72-73, 77, 79, 110-11, 127, 146-49; 151, 154, 160, 173, 179, 189-90, 193, 204, 356).   Dr. Preston counseled him that tobacco is a horrible poison that adversely affects every system of the body, that smoking could kill him, and that it causes conditions that could be worse than death.   (*See* Trial Tr. at 63-64, 109-110).   Plaintiff does not dispute the health risks and reduced life expectancy caused by smoking tobacco.   (*See* Trial Tr. at 407, 461-62).

Dr. Preston urged Mr. Hohenberger to cut down to smoking one pack of cigarettes per day, as "less is better than more."   (*See* Trial Tr. at 67, 73, 110-11).   He offered Mr. Hohenberger medication and a referral to a VA clinic to assist him with smoking cessation.   (*See* Tr. Ex. 1 at US 03489-90, 03517, 03549, 03560, 03572; Trial Tr. at 199-200, 205, 211).   Mr. Hohenberger declined to quit smoking.   (*See* Trial Tr. at 57, 64, 179; Tr. Ex. 1 at US 03559).   Dr. Preston recognized that Mr. Hohenberger's anxiety and depression made it more difficult for him to cut back or quit smoking.   (*See* Trial Tr. at 68, 110-11).   Mr. Hohenberger attempted to cut back his

17

smoking and tried nicotine lozenges and patches, but never quit smoking.   (*See* Tr. Ex. 1 at US 03726; Trial Tr. at 57, 64, 69, 72-73, 110-11, 146-47, 151, 154, 173, 179, 199-201, 212-13, 279-80, 357).

Mr. Hohenberger did not have a sedentary lifestyle.   He and his wife lived on a ranch, where he cared for their horses, cattle, pigs, and ducks.   (*See* Trial Tr. at 274-75).   He reported to Dr. Preston that he was active, chopping and carrying firewood, hunting for deer and elk, fishing, doing household chores such as cooking, washing dishes, vacuuming, and laundry, and planning to build his own house.   (*See* Trial Tr. at 54, 117, 124, 148-149, 162, 164, 194, 278, 282, 285-86, 290-91, 303-05, 361).

Dr. Preston consistently checked Mr. Hohenberger for diabetes, high blood pressure, and elevated cholesterol.   (*See* Tr. Ex. 1 at US 03364-66, 03390, 03496, 03517, 03547, 03574, 03590, 03661, 03671, 03714, 03716, 03721, 03730; Trial Tr. at 54, 63, 65, 67, 72, 77, 86, 113-14, 125, 137-138, 141-43, 146-51, 153, 157, 160, 166, 172, 179, 193-94, 209, 212, 349).   Mr. Hohenberger was not obese and did not have diabetes, high blood pressure, or elevated cholesterol.   (Trial Tr. at 54, 72, 113-115, 142, 148, 150, 166, 347, 450, Tr. Ex. 1 at US 03390, 03496, 03516, 03547, 03574, 03730).[6]   Mr. Hohenberger's only modifiable risk factor for CAD was his use of tobacco.   (*See* Trial Tr. at 107, 212, 347, 410, 450).

C.    Additional Tests and Treatment

Through her medical witness, Plaintiff contends that the standard of care required "a more aggressive evaluation" and additional testing, that is, treatment with cholesterol-lowering

---

[6]      On one occasion, Mr. Hohenberger's cholesterol was slightly elevated, but when it was re-checked, it was not elevated.   (*See* Trial Tr. at 113-14).   Elevated cholesterol is only significant if it is persistently elevated.   (*See* Trial Tr. at 114).   Even if Mr. Hohenberger had persistently high cholesterol, the treatment, a statin medication, was contra-indicated because of his history of alcohol use. (*See* Trial Tr. at 114, 387).

medicine, an exercise stress test, and an angiogram.   (*See* Trial Tr. at 406, 408-13, 415, 434-36, 438-39, 466).   The expert medical evidence differs as to the interpretation of Mr. Hohenberger's symptoms and the testing and treatment that was required by the standard of care.

Drs. Preston and Johnson have substantially more experience in primary care medicine and in treating patients than Dr. Jones.   (*See* Tr. Exs. 16, 17, 18).   Dr. Preston was personally familiar with Mr. Hohenberger for thirteen years.   Dr. Jones's opinions are not as consistent with the USPSTF and medical literature as are the opinions of Dr. Preston and Dr. Johnson.   (*See* Trial Tr. at 127-28, 334-36, 452).   Dr. Jones's opinions are admittedly based on hindsight.   (*See* Trial Tr. at 409, 417, 433).   His opinion that it was unreasonable not to offer Mr. Hohenberger more testing and treatment was based on a combination of symptoms such as frequent SOB, elevated cholesterol, and diffuse atherosclerosis that are not present in the medical record.   (*See* Trial Tr. at 429-30, 438-40, 465-66).   Dr. Jones was not aware that Mr. Hohenberger was hospitalized for several days for herpes simplex encephalitis in July of 2005 or that he experienced low testosterone levels.   (*See* Trial Tr. at 444).   He also relied on the existence of bradycardia and "ST wave changes on his EKGs" that do not support a finding of CAD.   (*See* Trial Tr. at 427, 438, 446-49).

Dr. Jones's opinions were based to a certain extent on supposition.   (*See, e.g.*, Trial Tr. at 410 ("if someone had done a stress test and the stress test had shown the suggestion of a narrowed artery . . . then you would start upgrading your type of care.   You would have probably put him on a cholesterol lowering agent. You would have possibly offered him advanced testing beyond stress testing such as an angiogram . . . ."), 430 ("If . . . it had been shown that he had an abnormal stress test, . . . I would have at least started him on a cholesterol-lowering agent based on the fact that I had an abnormal stress test."), 466 ("a stress test would have perhaps stratified

him better to urge him to become better about his lifestyle, to offer that an angiogram could be performed . . . . He could have also been offered nitroglycerin for his shortness of breath . . . He could have been offered aggressive aspirin therapy."). Given the undisputed evidence that tobacco smokers have a reduced life expectancy, Dr. Jones's opinion that if Mr. Hohenberger had received appropriate treatment he could have lived a normal lifespan of 82 years is unpersuasive. (*See* Trial Tr. at 357, 437, 461).

The evidence shows that Dr. Preston knew the risk factors and symptoms of CAD. Dr. Preston considered Mr. Hohenberger's risk for developing CAD at every primary care visit. It was Dr. Preston's regular practice at every primary care visit to conduct a review of all body systems, including the patient's heart, and to ask his adult male patients if they had experienced any chest pain. (*See* Trial Tr. at 55, 67, 71, 82-84, 141-42, 232). The evidence supports the conclusion that Mr. Hohenberger's two reports of SOB and few reports of generalized fatigue were related to conditions other than CAD. Nor did Mr. Hohenberger's bradycardia and some athlerosclerosis indicate the presence of CAD.

Dr. Preston is familiar with exercise stress tests, having ordered and performed hundreds of exercise stress tests during his thirty-year career as a primary care physician. (*See* Trial Tr. at 128-29). In patients who are asymptomatic for CAD, exercise stress tests have a false positive rate as high as 70 to 80 percent. (*See* Trial Tr. at 127-28, 333-34, 336, 351, 412). Because Mr. Hohenberger did not have symptoms of CAD, Dr. Preston did not order an exercise stress test. (*See* Trial Tr. at 128-29, 350, 378). It is speculative what assistance an exercise stress test would have provided in Mr. Hohenberger's case. (*See* Trial Tr. at 353, 410, 458). For a patient like Mr. Hohenberger who does not have symptoms of CAD, the standard of care requires that a primary care physician identify the risk factors for CAD and attempt to modify those risk factors

that can be changed, but does not require an exercise stress test.   (*See* Trial Tr. at 125, 127-29, 325, 331, 337, 339, 350, 370, 378, 383, 410-11).   This standard of care is consistent with the recommendations of the USPSTF and the American College of Cardiology.   (*See* Trial Tr. at 127-28, 334-36, 452).   This standard of care does not change regardless of whether the patient is at intermediate or high risk of developing CAD.   (*See* Trial Tr. at 126).

The persuasive weight of the evidence demonstrates that Mr. Hohenberger did not report or exhibit typical or atypical symptoms of CAD while he was in Dr. Preston's care.   Throughout their thirteen-year doctor-patient relationship, Dr. Preston ordered numerous appropriate tests and treatment for Mr. Hohenberger.   In addition to attempting to reduce Mr. Hohenberger's risk of developing CAD, Dr. Preston assessed and addressed a range of medical conditions for Mr. Hohenberger, from COPD to possible lung cancer.   (*See*, e.g., Tr. Ex. 1 at US 03494-97, 03547-49, 03589-90, 03725-26; Trial Tr. at 66, 187-190, 202, 344-45).   Dr. Preston did not ignore Mr. Hohenberger's symptoms; rather, he examined the total context of the complaints or symptoms and reasonably determined that they were not related to CAD.   (*See* Trial Tr. at 381). The evidence shows that Dr. Preston's approach was consistent with the standard of care for the diagnosis and treatment of CAD in an asymptomatic patient like Mr. Hohenberger.   Plaintiff has failed to demonstrate by a preponderance of the evidence that Dr. Preston breached the standard of care by not performing further testing and treatment.   (*See* Trial Tr. at 127, 316, 334-35, 375-76).

D.   Conclusion

Plaintiff has failed to establish by a preponderance of the evidence that Dr. Preston breached the standard of care for a primary care physician in diagnosing and treating Mr.

Hohenberger.   *See Day v. Johnson*, 255 P.3d 1064, 1069 (Colo. 2011) ("That standard of care is measured by whether a reasonably careful physician of the same school of medicine as the defendant would have acted in the same manner as did the defendant in treating and caring for the patient.") (*en banc*).   Nor has Plaintiff proved by a preponderance of the evidence that any breach of the standard of care caused Mr. Hohenberger's death, as is required to prove a claim of negligence under the FTCA.   Judgment shall be entered for the United States pursuant to Fed. R. Civ. P. 54 and Fed. R. Civ. P. 58.   Defendant is awarded its costs.

As the court did not consider paragraphs 165 or 166 of the USA's Proposed Findings of Fact and Conclusions of Law for purposes of this Memorandum Opinion and Order, Plaintiff's Motion to Strike Portions of Defendant's proposed Findings or in the Alternative Plaintiff's Motion to Be Heard Pursuant to Rule 201(e) (filed on September 7, 2015) (Doc. # 71) is DENIED AS MOOT.

DATED at Denver, Colorado this 21st day of October, 2015.

BY THE COURT:


    s/ Craig B. Shaffer
United States Magistrate Judge